IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**MIDSHORE RIVERKEEPER**           \*
**CONSERVANCY, INC., now known as**   \*
**SHORERIVERS, INC.,**                   \*
                                                      \*
          **Plaintiff,**                     \*
**v.**                                                   \*       **Civil Case No. SAG-17-3769**
                                                      \*
**JAMES FRANZONI,** *et al.,*               \*
                                                      \*
          **Defendants.**                 \*
                                                      \*
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiff Midshore Riverkeeper Conservancy, Inc., now known as ShoreRivers, Inc. ("Riverkeepers"), filed a Second Amended Complaint against Defendants James Franzoni, Michael Schaefer, The Point at Pintail, LLC, and New Pintail Point, LLC (collectively "Defendants"), seeking to (1) enforce Section 7002(a)(1)(B) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C.§ 6972(a)(1)(B), and (2) enforce Section 301 of the Clean Water Act ("CWA"), 33 U.S.C. § 1311(a). ECF 40-2. Three of the Defendants, Michael Schaefer, New Pintail Point, LLC, and The Point at Pintail, LLC ("the Schaefer Defendants"), filed a Motion to Dismiss the Second Amended Complaint, with a supporting memorandum of law (collectively, "the Motion"). ECF 49, 51.[1] This Court has considered that Motion, along with Riverkeepers's Opposition, ECF 52, and the Schaefer Defendants' Reply, ECF 56. No hearing is necessary. *See*

---

[1] The other Defendant, James Franzoni, is a co-member of New Pintail Point, LLC and The Point at Pintail, LLC, with Schaefer. Franzoni and Schaefer are currently embroiled in litigation in state court over control and decisionmaking for New Pintail Point, LLC and the Point at Pintail, LLC ("the LLC Defendants"), and an interlocutory appeal is pending before the Maryland Court of Special Appeals. *See Franzoni v. Schaefer, et al.,* CSA-REG-0553-2018. At present in this case, however, Schaefer's attorney is representing the LLC defendants, and Franzoni has separate counsel.

Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, the Schaefer Defendants' Motion will be granted in part and denied in part.

I.   **FACTUAL BACKGROUND**

The facts below are derived from the Second Amended Complaint and accepted as true for the purposes of this Motion. Riverkeepers is a 501(c)(3) non-profit corporation working to restore and protect the Wye River and its associated waterways. ECF 47, ¶ 4. Riverkeepers's members include more than one thousand individuals and families. *Id.*

Defendants Franzoni and Schaefer are co-owners of the two LLC Defendants. *Id.* ¶ 5. Defendants own and operate the Pintail Point Shooting Clay School ("Pintail Point"), "a recreational sporting clay course and shooting range that is open year-round and located along the Wye River" in Queenstown, Maryland. *Id.* Pintail Point consists of roughly 300 acres, including a large pond, plus four miles of shoreline along the Wye River. *Id.* ¶ 17. Riverkeepers alleges, on information and belief, that "the shooting range has 25 shooting stations that are positioned such that shooting can occur directly over the large pond or such that spent lead shot lands on downward slopes that drain to either the pond or the Wye River itself through manmade drainage ditches." *Id.* Riverkeepers also alleges, upon information and belief, that shooting occurs over, or in close proximity to, agricultural land, where crops are harvested. *Id.* ¶ 18. Riverkeepers alleges that lead shot has been used at Pintail Point since the shooting range opened almost thirty years ago. *Id.* ¶ 20. Spent lead shot "is abandoned and left to leach into the surrounding environment," with no efforts to clean it up or dispose of it. *Id.*

In early 2015, Franzoni allowed Riverkeepers to test for lead at Pintail Point. *Id.* ¶ 22. The sample results indicated dangerously high levels of lead, prompting Riverkeepers to request further testing. *Id.* At that time, however, Franzoni denied further access. *Id.* Franzoni engaged in additional discussions with Riverkeepers over the ensuing months, and represented that he would

arrange for lead abatement, stop planting crops near the shooting range, and cease shooting lead. *Id.* ¶¶ 23-28. In early 2017, Franzoni hired MT2, a remedial services company, to perform a site visit and conduct lead testing. *Id.* ¶ 29. MT2's report confirmed "dangerously elevated levels of lead at Pintail Point." *Id.*

On July 7, 2017, Riverkeepers sent a notice ("the Notice") to Franzoni, Schaefer, and their LLCs, and copied relevant government officials, including the Environmental Protection Agency and the Maryland Department of the Environment. ECF 47-2. The Notice, consisting of twelve pages plus additional exhibits, advised that Riverkeepers intended to file suit "pursuant to Section 7002(a)(1)(B)" of the RCRA, alleging "that Owners/Operators' past and continuing disposal of lead shot at Pintail Point presents an imminent and substantial endangerment to health and the environment." ECF 47-2 at 3. The Notice also stated that Riverkeepers intended to file a citizen suit under the CWA, alleging "that Owners/Operators' past and continuing practices at Pintail Point, since at least March 19, 2012, has [sic] resulted in unlawful discharges of pollutants from a point source into waters of the United States, without the authorization of a National Pollutant Discharge Elimination System ('NPDES') permit." *Id.*

After receiving Riverkeepers's Notice, Franzoni informed the Riverkeepers board that shooting operations at Pintail Point would cease. ECF 47, ¶ 31. Franzoni then wrote to Schaefer to demand that they agree to cease commercial shooting at Pintail Point, despite their ownership dispute. *Id.* ¶ 32. However, presumably because of the dispute between Franzoni and Schaefer as co-owners, shooting at the range continued as of the date of the Second Amended Complaint. *Id.* ¶ 33.

## II. LEGAL STANDARDS

The Schaefer Defendants have filed a motion to dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF 49. A defendant is permitted to test the legal sufficiency of a complaint by way of a motion to dismiss. *See, e.g.*, *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Rule 8(a)(2), which provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions.'"); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. ___, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a

complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. Maryland Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, a court is not required to accept legal conclusions drawn from the facts. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts generally do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" through a Rule 12(b)(6) motion. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999) (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc);

5

*accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[] on the face of the complaint,'" *Goodman*, 494 F.3d at 464 (emphasis omitted) (quoting *Forst*, 4 F.3d at 250).

## III. ANALYSIS

### A. Adequacy of Notice

In addition to their Rule 12(b)(6) motion, as to both the RCRA and the CWA counts, the Schaefer Defendants seek dismissal for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), alleging that Riverkeepers's notice of intent to sue was inadequate. Specifically, the RCRA provides:

> No action may be commenced under subsection (a)(1)(B) of this section prior to ninety days after the plaintiff has given notice of the endangerment to (i) the Administrator; (ii) the State in which the alleged endangerment may occur; (iii) any person alleged to have contributed or to be contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in subsection (a)(1)(B), except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of subchapter III of this chapter.

42 U.S.C. § 6972(b)(2)(A) (2012). Similarly, the CWA provides:

> No action may be commenced under subsection (a)(1) of this section prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order . . ..

33 U.S.C. § 1365(b)(1)(A). The Supreme Court has explained that the pre-filing notice requirement for citizen suits is a "mandatory, not optional, condition precedent." *Hallstrom v. Tillamook County,* 493 U.S. 20, 26 (1989); *see also id.* at 31. Congress implemented the notice requirement to allow government agencies, in the first instance, to enforce the relevant regulations,

and to allow the alleged violator, if it wishes, to take appropriate steps toward compliance before being sued. *See id.* at 29.

While the mandatory nature of the pre-suit notice is not in dispute, fewer cases have dealt with the substantive content required in the notice. Regulations implementing both the RCRA and the CWA require that the notice include,

> sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a) (the CWA); *id*. § 254.3(a) (the RCRA).

In addition to the Schaefer Defendants' general, unpersuasive allegations that the factual content of the Notice was somehow inadequate, ECF 51 at 9-12, they complain of three specific deficiencies in the Notice.[2] First, they argue that the allegations in the Second Amended Complaint, regarding imminent and substantial endangerment to health and the environment caused by abandoned clay target fragments as the source of Polycyclic Aromatic Hydrocarbons ("PAHs"), were not contained in the Notice. *Id.* at 12-13. This Court agrees. The Notice contains two incidental references to "clay debris," ECF 47-2 at 4, 11, but it does not describe abandoned clay target fragments as an independent source of pollution, and makes no reference to PAHs

---

[2] The Schaefer Defendants also argue that because Maryland is an authorized enforcement state, the Notice for a citizen suit under the RCRA and the CWA has to refer to state-enacted statutes or regulations. ECF 51 at 12. However, Riverkeepers simply alleges "an imminent and substantial endangerment to health or the environment" under § 6972(a)(1)(B) of RCRA, and such allegations are equally viable in authorized states. *See Blumenthal Power Co., Inc. v. Browning-Ferris, Inc.*, Civil No. 94CV2612, 1995 WL 1902124, at *3 (D. Md. Apr. 19, 1995). Moreover, a plaintiff suing under § 6972(a)(1)(B) "need not include specific provisions of the [RCRA] allegedly violated" in its Notice. *Id.* at *4. Finally, none of the other cases the Schaefer Defendants cite hold that a plaintiff must refer to state law in notifying a defendant of a Clean Water Act violation. *See Covington v. Jefferson County*, 358 F.3d 626, 636 (9th Cir. 2004); *Marcas v. Bd. of Cty. Com'rs of St. Mary's Cty.*, 817 F. Supp. 2d 692, 733-37 (D. Md. 2011).

whatsoever. In *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 629 F.3d 387, 401 (4th Cir. 2011), the Fourth Circuit found notice to be inadequate as to certain pollutants that were not alleged in the plaintiff's notice letter, and overturned the violations that the district court had found pertaining to those pollutants. The same situation is presented here. Accordingly, the Schaefer Defendants' motion to dismiss under Rule 12(b)(1) will be granted as to Riverkeepers's RCRA allegations relating to abandoned clay target fragments and PAHs, due to lack of appropriate notice.

The second specific deficiency the Schaefer Defendants allege pertains to the "point source" identified in Riverkeepers's CWA claim. ECF 51 at 13-14. In relevant part, the Notice proffers that courts have determined that "a shooting range may be a point source," ECF 47-2 at 10, and further states:

> The Wye River is navigable water where people fish, swim, and recreate. Although patrons of Pintail Point are less likely to shoot directly over the river, several stations are close enough to it that lead shot and debris still directly enter the water. For each lead shot that falls directly into the river, Pintail Point is blatantly committing an ongoing violation of the CWA. However, CWA liability is not limited to discharges of pollutants *directly* into navigable waters. *See, e.g., Rapanos v. United States,* 547 U.S. 715, 743 (2006) (plurality opinion) ("a point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters.'"). When it rains, streams run from the grey area beyond "Site 6" down to "Water 1," carrying lead-contaminated sediment into the Wye River. *See* Attachment 1. This also constitutes a violation of the CWA. *See N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC,* 278 F. Supp. 2d 654, 680 (E.D.N.C. 2003) (finding that where pollution was reaching a navigable water through naturally developed gullies and ditches, these conveyances are point sources, and the fact that the defendant did not actually construct the conveyance did not relieve it of liability under the CWA).

*Id.* at 10-11.

In the Second Amended Complaint, like in the Notice, Riverkeepers alleges that "a shooting range is a point source." ECF 47, ¶ 72. However, in the Second Amended Complaint,

8

Riverkeepers further alleges the existence of "manmade drainage ditches carrying clay target fragments, lead debris, lead contaminated soil and lead contaminated water to the Wye River directly and to the pond on the site that discharges into the Wye River through the manmade dam." *Id.* ¶ 74. While there are unquestionably distinctions between the Second Amended Complaint and the Notice as to the specific structures at Pintail Point § causing pollutants to drain into the Wye River, the overall contention that the shooting range is itself a point source remains the same. Additionally, the suggestion that water sources at Pintail Point drain into the Wye River also remains constant, although the "manmade drainage ditches" and "manmade dam" were not identified in the Notice. *See* ECF 47-2 at 10-11. In considering a case with a similar discrepancy, as to the precise "point source," between the Notice and the subsequent Complaint, this Court reasoned:

> Defendant's focus on Plaintiff's theories as to the precise mechanism of the point source discharge is inapposite to a review of the statutory and regulatory notice requirement. Plaintiff, after all, need not 'list every specific aspect or detail of [the] alleged violation' in its [Notice] letter to Defendant . . . This Court is satisfied that Plaintiff's [Notice] letter provided Defendant with enough information to identify and attempt to correct this alleged violation. The statute and regulation require no more."

*Potomac Riverkeeper, Inc. v. Marcella M. Klinger, LLC,* Civil No. JKB-13-801, 2013 WL 5505397, at *4 (D. Md. Oct. 1, 2013). At the motion to dismiss stage, this Court is unpersuaded that the minor variances between the Notice and the Second Amended Complaint require dismissal of the CWA count.

Third, the Schaefer Defendants argue that the notice is insufficient because the Second Amended Complaint contains allegations from two Riverkeepers members, Michael Batza, Jr. and Nina Houghton, about the harm they are incurring from Defendants' operation of Pintail Point. ECF 51 at 15-16; *see* ECF 47, ¶¶ 10-11. The Schaefer Defendants assertion that these new allegations render the notice insufficient because the issues Mr. Batza and Ms. Houghton raise

9

"were not within the scope of the Plaintiff's Notice letter." ECF 51 at 16. This argument is unpersuasive. As previously detailed, the RCRA and CWA merely require that the Notice letter give the Schaefer Defendants notice as to which standard is violated, which activity causes the violation, the person(s) responsible, the location of the violation, when the violation occurred, and the information of the person giving notice. 40 C.F.R. §§ 135.3(a), 254.3(a). Nothing in the EPA's regulations require Riverkeepers to notify the Schaefer Defendants the precise harm that their violation causes to individuals. This makes sense, given that the notice requirement is focused on allowing the alleged violator to take remedial steps to achieve compliance with, and aid government agencies in enforcing, environmental regulations. *See Hallstrom*, 493 U.S. at 29. Moreover, each harm that Mr. Batza and Ms. Houghton allege is covered in the Notice letter, *compare* ECF 47, ¶¶ 10-11, *with* ECF 47-2 at 7-11 (describing the potential for lead to enter the Wye River, infect nearby crops, be eaten by grazing animals, and seeping into the soil).

Fourth, the Schaefer Defendants allege that the Notice fails to allege the violation of a specific limitation or standard of the CWA. ECF 51 at 16-17. Although the Notice does not cite the standard for lead pollution in the CWA, it clearly describes the nature of the pollutant and the general method of discharge. *See* ECF 47-2 at 6-7, 10-11. The requirement is not that the standard be alleged in the Notice, but that the Notice provide "sufficient information to permit **the recipient** to identify the specific standard, limitation, or order alleged to have been violated." 40 C.F.R. § 135.3(a) (emphasis added); *see also* 40 C.F.R. § 254.3(a). The information contained in the Notice clearly sufficed to allow the Defendants to identify the CWA provisions relating to lead and lead shot as those being violated by its conduct.

### B. The Motion to Dismiss Plaintiff's RCRA Claims in Count I

The Schaefer Defendants allege that they cannot be held liable under the RCRA, which allows suit against any person "who has contributed or is contributing to the past or present

10

handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). Thus, to state a claim under the RCRA, Riverkeepers must allege mishandling of some "solid or hazardous waste." *Id.* Under the RCRA, "hazardous waste" is a subset of "solid waste." 42 U.S.C. § 6903(5). The Schaefer Defendants allege that spent lead shot does not qualify as a "solid waste," as defined in the RCRA statute. ECF 51 at 17-23.

In implementing the RCRA, the EPA has "create[d] a dichotomy in the definition of solid waste." *Conn. Coastal Fishermen's Ass'n v. Remington Arms Co.*, 989 F.2d 1305, 1314 (2d Cir. 1993). The EPA has promulgated regulations specifically governing how it identifies and lists hazardous waste. Those regulations include a distinct definition of "solid waste" that "applies only to wastes that are also hazardous for purposes of the regulations implementing subtitle C of [the] RCRA." 40 C.F.R. § 261.1(b)(1); *see Military Toxics Project v. EPA*, 146 F.3d 948, 951 (D.C. Cir. 1998). The regulatory definition of "solid waste" is narrower than the companion definition found in the statute, *Remington Arms*, 989 F.2d at 1314, because under the regulation, "solid waste" includes only "discarded material" that is "abandoned," as those words are defined in the regulations. *See* 40 C.F.R. §§ 261.1(b)(1), 261.2(a)(2)(i)(A), 261.2(b). This regulatory definition of "solid waste," the EPA has clarified, only applies to suits brought under 42 U.S.C. § 6972(a)(1)(A). 40 C.F.R. § 261.1(b)(1); *see Remington Arms*, 989 F.2d at 1315.

Conversely, the statutory definition of "solid waste" applies to suits brought under 42 U.S.C. § 6972(a)(1)(B), providing for liability where the defendant creates "an imminent and substantial endangerment." 40 C.F.R. § 261.1(b)(2)(ii); *see Remington Arms*, 989 F.2d at 1315; *Military Toxics Project*, 146 F.3d at 951. The statute defines "solid waste" as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility

11

and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities . . . ." 42 U.S.C. § 6903(27).

The Schaefer Defendants contend that the EPA has repeatedly opined that spent shot at outdoor shooting ranges is not a solid waste under the RCRA, and that its interpretation must be given deference. ECF 51 at 17-23. However, the EPA appears to recognize the distinction between the regulatory and the statutory definitions of "solid waste." The Best Management Practices the EPA issued for maintenance of shooting ranges, as revised in June, 2005, specifically asserts that, "spent lead shot (or bullets), left in the environment, is subject to the broader definition of solid waste written by Congress and used in sections 7002 and 7003 of the RCRA statute." ECF 51-1 at 28 (Ex. 2). More specifically, the EPA opines:

> Sections 7002 and 7003 of the RCRA statute allow EPA, states or citizens to use civil lawsuits, to compel cleanup of or other action for "solid waste" (e.g., spent lead shot) posing actual or potential imminent and substantial endangerment. Such actions can be sought whether the range is in operation or closed, and is based solely on a determination that harm is being posed or may be posed by the range to public health and/or the environment. Since the risk of lead migrating increases with time, making ranges that have not removed lead more likely candidates for government action or citizen lawsuits under RCRA Section 7002 and 7003, ranges are advised to maintain a schedule of regular lead removal.

*Id.* Thus, the EPA's own guidance to shooting ranges recognizes the viability of a § 6972(a)(1)(B) claim pertaining to spent lead shot "discarded" on their premises.

Most of the cases cited by the Schaefer Defendants do not undermine the EPA's position in its June, 2005 Best Practices Manual. These cases, save for one, are rulings on § 6972(a)(1)(A) claims, which, as previously illustrated, premise liability upon the EPA's separate and distinct regulatory definition of "solid waste." *See, e.g.*, *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502 (9th Cir. 2013) (deciding that wood preservative that escaped from wooden

utility poles as they aged was not "discarded," rendering it not "solid waste" under the regulatory definition); *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 209 (2d Cir. 2009) (declining to reach the issue of "whether lead on Metacon's site has been 'discarded' within the meaning of the statutory definition of solid waste" for purposes of an imminent and substantial endangerment claim under § 6972(a)(1)(B)); *Remington Arms*, 989 F.2d at 1316 (holding that lead shot left at site of gun range no longer in operation had been "discarded" for purposes of the RCRA's statutory definition); *Krause v. Omaha*, No. 8:15CV197, 2015 WL 5008657, at *4-5 (D. Neb. Aug. 19, 2015) (considering a § 6972(a)(1)(A) claim about road salt left on roadways, and not adjudicating the statutory definition.); *Long Island Soundkeeper Fund, Inc. v. N.Y. Athletic Club of N.Y.C.*, No. 94 Civ. 0439 (RPP), 1996 WL 131863, at *9 (S.D.N.Y. Mar. 22, 1996) (ruling that spent shot and target fragments do not fall within the narrower regulatory definition of "solid waste" for purposes of a claim under § 6972(a)(1)(A) and not adjudicating the statutory definition). In fact, the language of *Ecological Rights* bolsters the notion that spent lead shot has been "discarded." *See* 713 F.3d at 515 ("[T]he key to whether a manufactured product is a 'solid waste,' then, is whether that product "ha[s] served [its] intended purpose [] and [is] no longer wanted by the consumer." (alterations in original) (citing the legislative history of the RCRA statute)).

The Schaefer Defendants cite one case, *Otay Land Co. v. U.E. Ltd., L.P.*, 440 F. Supp. 2d 1152 (S.D. Cal. 2006), which held that spent lead shot did not constitute "solid waste" for purposes of a § 6972(a)(1)(B) claim. That case purported to rely on the EPA's interpretation of the RCRA, without addressing the Best Practices Manual cited above. *Id.* at 1179-82. *Otay,* which has been overruled on other grounds, *Otay Land Co. v. U.E. Ltd.*, 338 F. App'x. 689 (9th Cir. 2009), is nonbinding, and is unpersuasive because it does not discuss what appears to be the most recent, and relevant, EPA guidance.

Because Riverkeepers sued only under the imminent and substantial endangerment provision, § 6972(a)(1)(B), it does not need to establish that spent lead shot constitutes hazardous waste, or even meets the narrower definition of "solid waste" in the regulations. *See Remington Arms,* 989 F.2d at 1316 ("RCRA regulations apply the broader statutory definition of solid waste to imminent hazard suits."); *see also Military Toxics Project*, 146 F.3d at 951. Thus, Riverkeepers need not demonstrate that the lead shot was "abandoned," but merely needs to allege that it has been "discarded." See 42 U.S.C. § 6903(27). Riverkeepers's Second Amended Complaint specifically alleges,

> On information and belief, lead shot has been used at the range since it opened almost 30 years ago. To Riverkeepers' knowledge, there has been no concerted effort to clean up or dispose of the lead shot used at the range. Spent lead shot is abandoned and left to leach into the surrounding environment.

ECF 47, ¶ 20. Without reaching the issue of exactly when spent shot is "discarded," it is certainly plausible that lead shot that has been sitting almost thirty years, without being cleaned up, would qualify. *See Remington Arms*, 989 F.2d at 1316.

Finally, the Schaefer Defendants suggest that the Complaint consists of insufficient facts, and that the facts, when proven, will establish that Defendants are not liable. ECF 51 at 24-28. That analysis exceeds the Court's role at the motion to dismiss stage, which consists of assuming the truth of the allegations in the Complaint and determining whether they amount to a plausible claim. Under that relatively lenient standard, the Second Amended Complaint survives, because it alleges that lead shot has accumulated and remained on the premises for almost thirty years, without any efforts to remove it.

The Schaefer Defendants' doomsday scenario about the effect of this Court's ruling on shooting ranges in general, ECF 51 at 28, clearly overstates the import of denying their Motion to Dismiss.[3] This ruling simply finds Riverkeepers's allegations sufficient to proceed to discovery.

**C.     The Motion to Dismiss Riverkeepers's CWA Claims in Count II**

Next, the Schaefer Defendants argue that Count II of the Second Amended Complaint insufficiently alleges liability under the Clean Water Act ("CWA"). The CWA prohibits the "discharge of any pollutant by any person" into navigable waters, unless the person has a permit for the discharge. 33 U.S.C. §§ 1311(a), 1342. Because this is a citizen suit enforcing the CWA, Riverkeepers must also allege that the Schaefer Defendants' violation of the Act is "continuous or intermittent." *See id.* § 1365(a)(1); *Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 57 (1987). Thus, Riverkeepers must allege facts to show that the Schaefer Defendants caused (1) a pollutant (2) to be discharged (3) from a point source (4) into a navigable water (5) without a permit (6) continuously or intermittently. The Court is satisfied that the facts alleged in the Second Amended Complaint plausibly allege each of these elements.

        1.     <u>Riverkeepers plausibly alleges the existence of pollutants.</u>

First, regarding the presence of a pollutant, Riverkeepers alleges that the shooting stations at Pintail Point allow pollutants, such as lead and shot debris, to enter the Wye River, both directly and indirectly. ECF 47, ¶¶ 74-75. The Act defines a "pollutant" as including, *inter alia*, "solid waste," "garbage," "munitions," and "chemical wastes" that are "discharged into water." 33 U.S.C. § 1362(6). The Schaefer Defendants recognize that "[l]ead shot fired into waters of the United States may be a pollutant," but argue that "lead shot landing in uplands is not a pollutant to

---

[3] As noted above, this Court is not the first to consider a claim that residual lead shot at a shooting range violates RCRA or the CWA. The rulings in those previous cases have not led to the demise of clay shooting ranges, or to a flood of RCRA cases clogging the federal courts.

15

[sic] under the CWA." ECF 51 at 33-34. Yet the Second Amended Complaint, as discussed more fully *infra*, alleges that the lead and shot debris makes its way into the Wye River, and that "shooting continues at Pintail Point" today. ECF 47, ¶¶ 33, 74-75. This is a sufficient factual basis to plausibly conclude that lead and shot debris are "pollutants," as defined in the Act.

2. Riverkeepers plausibly alleges that two point sources discharge pollutants.

To the second and third elements, there are sufficient factual allegations to conclude that lead and shot debris were "discharged" from "point sources." The Act broadly defines the "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). A "point source," in turn, includes "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." *Id.* § 1362(14). The Second Amended Complaint alleges three different types of point source discharges, but only two of these alleged point sources are supported by sufficient factual allegations.

First, Riverkeepers alleges, upon information and belief, that Pintail Point shooting stations are point sources, directly discharging pollutants because they are "close enough to the pond on the property and the [Wye River] itself that lead shot and debris could directly enter the water." ECF 47, ¶ 75. The Schaefer Defendants argue that this allegation is insufficient, because this mere "speculation" is not enough to establish that a violation has occurred. ECF 50 at 31-32. This argument is unpersuasive. Riverkeepers's use of "upon information and belief" to plead its claims is not inappropriate here, because the evidence needed to prove these claims is within the Schaefer Defendants' control. Namely, they must give Riverkeepers the ability to come onto their land to conduct tests to verify these factual allegations. It is improper to dismiss this theory of liability without allowing discovery. *See Malibu Media, LLC v. Doe*, No. PWG-13-365, 2014 WL

16

7188822, at *4 (D. Md. Dec. 16, 2014) (noting the importance of differentiating "between a case in which pleading 'upon information and belief' is used as an inadequate substitute for providing detail as to why the element is present in an action . . . [and the] proper use of 'upon information and belief,' where a plaintiff does not have personal knowledge of the facts being asserted." (citations and internal quotation marks omitted)).

Riverkeepers next alleges that pollutants are indirectly discharged from shooting stations into the Wye River through a second point source, manmade drainage ditch channels. ECF 74, ¶ 74. Specifically, Riverkeepers alleges that when it rains, "streams run from the land surrounding the stations and [shot] fall zones through manmade drainage ditches carrying lead contaminated soil and water to the Wye River directly and to the pond on the site that discharges into the Wye River through the manmade dam." *Id.*

The Schaefer Defendants assert that these allegations are "nothing more than generalized speculation." ECF 50 at 33. They argue that Riverkeepers has not, and indeed cannot, allege with certainty that any shots landed in the water, or allege precisely how the manmade ditches and dams lead to the Wye River. *Id.* at 29-32. These arguments are unpersuasive. The issue, on a motion to dismiss, is not whether Riverkeepers can prove its case with certainty, but whether it has alleged plausible facts to establish the claim, particularly on points where discovery might be necessary to uncover conclusive proof. While the Court agrees that Riverkeepers cannot generally claim that all 300 acres of Pintail Point is a point source, that is not what the Second Amended Complaint alleges. As outlined above, Riverkeepers alleges that the concentrated areas wherein the Schaefer Defendants conduct their shooting operations accumulate lead, which then finds its way into ditches in the nearby land, and then goes either (1) into the Wye River itself, or (2) into a pond, which has a dam that leads to the Wye River. While Riverkeepers does not allege the precise

17

metes and bounds of each ditch, it need not at the motion to dismiss stage – it need only allege facts plausibly giving rise to a claim for relief. Riverkeepers has done just that.

Riverkeepers lastly alleges that lead indirectly reaches the Wye River from the shooting stations through groundwater. ECF 47, ¶ 36. Current Fourth Circuit precedent establishes that Riverkeepers may state a claim under the CWA for discharge of a pollutant from a point source that travels to jurisdictional water via groundwater, so long as Riverkeepers alleges a direct hydrological connection from the groundwater to the jurisdictional water.[4] *Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 887 F.3d 637, 651 (4th Cir. 2018). Riverkeepers has not done so. While the Second Amended Complaint alleges that lead shot "has a reasonable potential to pollute groundwater," it is devoid of allegations demonstrating a direct hydrological connection from that groundwater to the Wye River. *See* ECF 47, ¶¶ 36, 69-75, 89-99. This allegation will be dismissed without prejudice. *See 180s, Inc. v. Gordini U.S.A., Inc.*, 602 F. Supp. 2d 635, 638 (D. Md. 2009) (noting that the trial court has discretion to dismiss a plaintiff's claims on a Rule 12(b)(6) motion with or without prejudice).

        3.      <u>Riverkeepers plausibly alleges that the Wye River is a navigable water.</u>

Next, the Schaefer Defendants argue that there are no allegations that a pollutant is discharged into a navigable water. A "navigable water" is simply defined as any "water[] of the United States, including the territorial seas." 33 U.S.C. § 1362(7). The Supreme Court has expanded on this, finding that it encompasses "water as found in streams, oceans, rivers, lakes, and bodies of water forming geographical figures." *Rapanos v. United States*, 547 U.S. 715, 735 (2006). Riverkeepers alleges that the Wye River is a navigable water. ECF 47, ¶ 73. The Schaefer

---

[4] The Supreme Court recently heard oral argument on this issue in *Cty. of Maui v. Haw. Wildlife Fund,* 139 S. Ct. 1164 (2019) (granting writ of certiorari). A ruling in that case remains pending, meaning that *Upstate Forever* remains binding precedent in this Court.

Defendants argue that Riverkeepers's allegations focus on storm waters, asserting that "[w]ater flowing intermittently in a channel (i.e. after a rain) is not waters of the United States." ECF 50 at 34-35 (footnote omitted) (citing *Rapanos*, 547 U.S. at 735). This argument focuses too closely, however, on the *means* by which the allegedly polluted water makes its way to the ultimate navigable water, the Wye River. Riverkeepers is not seeking to hold the Schaefer Defendants liable for polluting the water that makes its ways into the manmade ditches or the pond on the Pintail Point land, but rather for polluting the navigable water (the Wye River) that the ditches carry that water to. *See* ECF 47, ¶¶ 74-75. Without any argument from the Schaefer Defendants that the Wye River itself is not a navigable water, the Court finds that Riverkeepers has plausibly alleged the presence of a navigable water.

    4. <u>Riverkeepers plausibly alleges continued operations at Pintail Point without a CWA permit, satisfying the final two prima facie elements.</u>

Fifth, Riverkeepers sufficiently alleges that the Schaefer Defendants continue to run their shooting operations without a valid CWA permit. ECF 47, ¶ 95. The Schaefer Defendants object, arguing that Riverkeepers cannot state a claim for relief because the Industrial Stormwater Rule applies in this case. ECF 51 at 35-37. Though the Schaefer Defendants will be free to assert that exception as an affirmative defense, Riverkeepers need not allege its inapplicability to survive a motion to dismiss. *See FTC v. Morton Salt Co.*, 334 U.S. 37, 44-45 (1948) ("[T]he burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits."). Moreover, as described above, Riverkeepers has plausibly alleged a number of discharges through point sources, and is not reliant on stormwater.

Lastly, as to the final element, Riverkeepers has alleged that operation of the shooting range continues to this day using lead shot, making the violation ongoing and continuous. ECF 47, ¶ 33; *see Gwaltney*, 484 U.S. at 57. Indeed, the Schaefer Defendants admit that "Pintail Point is an

ongoing operation." ECF 51 at 32; *see also* ECF 56 at 5 (The Schaefer Defendants' Reply, reiterating that shooting operations at Pintail Point continue). Accordingly, Riverkeepers has stated a viable claim for relief under the CWA, requiring a denial of the Schaefer Defendants' Motion as to Count II of the Second Amended Complaint.[5]

**IV.     CONCLUSION**

For the reasons set forth above, the Schaefer Defendants' Motion to Dismiss will be GRANTED IN PART as to Riverkeepers's RCRA claim pertaining to the clay target fragments and PAHs, and to Riverkeepers's CWA claim pertaining to the discharge of pollutants into the Wye River via groundwater, but DENIED IN PART as to the remaining claims in the Second Amended Complaint. A separate Order follows, and a Scheduling Order will issue.


Dated:  December 17, 2019                              /s/
                                                Stephanie A. Gallagher
                                                United States District Judge

---

[5] As a final note, the Court observes, as do the parties, that the Schaefer Defendants' Memorandum of Law in Support of their Motion, ECF 51, exceeded the page limitation allowed by this Court's Local Rules. *See* Loc. R. 105.3. Going forward, counsel for all parties are directed to ensure that any paper filed with the Court fully complies with the Local Rules.